In the Matter of ROBIN FRANKEL et al., Petitioners, and ASSOCIATION OF LEGAL AID ATTORNEYS IN THE CITY OF NEW YORK DISTRICT 65, UAW, Petitioner-Intervenor, v GEORGE ROBERTS, as Justice of the Supreme Court, New York County, et al., Respondents.

First Department, April 2, 1991

## APPEARANCES OF COUNSEL

*Laura R. Johnson* and *Michele Maxian* of counsel *(Robert M. Baum,* attorney), for petitioners.

*Leonard Leibowitz* for petitioner-intervenor.

*John J. Sullivan* of counsel *(Robert Abrams, Attorney-General,* attorney), for respondent.

*Paul H. Levinson* and *Steven J. Hyman* of counsel *(Leavy Rosensweig & Hyman,* attorneys), for New York Civil Liberties Union, *amicus curiae.*

## OPINION OF THE COURT

Asch, J.

Petitioners seek an order under CPLR article 78 to prohibit respondent Justice George Roberts from enforcing his judgment and order requiring petitioners, on penalty of being relieved or held in contempt, to remove a political button from their lapels which states "Ready To Strike".

The incident in question took place in Part 30 of the New York Supreme Court, Criminal Term, where only arraignments, initial plea bargaining and motion practice are conducted. Hearings and trials with witnesses and jurors are conducted in other courtrooms.

On October 4, 1990, petitioner Robin Frankel an attorney employed by petitioner Legal Aid Society was ordered to remove the "Ready To Strike" button from her lapel. When she refused to do so, she was summarily removed as counsel for petitioner Albert Smith who was a criminal defendant in a proceeding now pending before Justice George Roberts and an "18-B" attorney was assigned to represent him. Petitioner Troy Yancey, also an attorney employed by the Legal Aid Society, on the same date, was ordered to remove a similar button from her lapel. On her refusal to do so she was ordered from the court and instructed not to return to represent any defendant while wearing that button.

Judge Roberts announced he would relieve the Legal Aid Society as counsel whenever a case was called if the Legal Aid attorney wore a "Ready To Strike" button. He stated further, that on the next day any such attorney would be summarily held in contempt and an appropriate sanction imposed. Justice Roberts sought to explain that he was not taking any position on the threatened strike but would not have the attorneys "politicizing" an issue "extraneous to the work that is conducted in this courtroom."

Justice Roberts has on his own accord stayed his order upon petitioner's agreement to file this article 78 application and seek an expeditious determination.

In *La Rocca v Lane* (37 NY2d 575, *cert denied* 424 US 968) a priest-lawyer, working for the Legal Aid Society as a defense attorney, brought an article 78 proceeding because the Trial

Judge refused to allow him to wear his clerical collar while appearing before the jury in the course of a trial. While the Court of Appeals affirmed the trial court's order, it did so only because "the particular limited religious practice has been found to conflict with the State's paramount duty to insure a fair and impartial trial. The respective interests must be balanced to determine whether the incidental burdening is justified" *(supra,* at 583). In *La Rocca,* the Court of Appeals found that a jury might view statements made by a member of the clergy differently then those of others and might ascribe a greater degree of veracity and personal commitment to the rightness of his client's cause. On the other hand, religious prejudices, often insidious and unstated, might spill over from the lawyer-cleric to the defendant. The court therefore decided that the trial court by compelling defense counsel to remove the symbol of his religious calling before the jury, while incidentally limiting counsel's right to free exercise of religion, acted to preserve the right of both the defendant and the People to a fair trial *(supra,* at 584). Obviously, the *La Rocca* principles do not impel a similar result in the case before us. Even assuming the button might predispose a juror to favoritism or prejudice as to counsel's client, Justice Roberts' part had no jury to be impressed favorably or unfavorably.

We find that the mere act of wearing a button which has some expression of political import, under the circumstances herein, is an exercise of speech protected under the First Amendment of the US Constitution and article I, § 8 of the NY Constitution. While the Trial Judge had the inherent power, in fact the obligation, to require order in the courtroom, the right of an individual under the First Amendment may not be limited or subordinated in his freedom of expression to anything less than the absolute requirement to prevent the obstruction of justice. " '[T]rial courts . . . must be on guard against confusing offenses to their sensibilities with obstruction to the administration of justice.' " *(In re Little,* 404 US 553, 555, quoting *Brown v United States,* 356 US 148, 153.)

The freedom of expression protection afforded by the First Amendment and article I, § 8 unquestionably extends to the courtroom. "Every citizen lawfully present in a public place has a right to engage in peaceable and orderly expression that is not incompatible with the primary activity of the place in question, whether that place is a school, a library, a private lunch counter, the grounds of a statehouse, the grounds of the United States Capitol, a bus terminal, an airport, or a welfare

center. As we stated in *Grayned* v. *City of Rockford,* 408 U.S. 104, 116 (1972), '[t]he crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time.' " *(United States v Grace,* 461 US 171, 184-185 [Marshall, J., concurring in part and dissenting in part].) Thus, petitioners wearing a button with a political slogan would be entitled to the same protection that would be afforded if the button were worn in any other public place. This manner of expression was not basically incompatible with the normal activity and operation of this courtroom devoid of jurors or witnesses.

As such, it clearly presented no "serious and imminent threat to the administration of justice". *(See, Craig v Harney,* 331 US 367, 373.) "[W]hile it is the duty of a Judge to preserve order and to insure that justice is not obstructed, it nevertheless follows that any order or regulation imposed upon attorneys practising before him, must be based upon factual conditions which leave no doubt that a continuance of the proscribed conduct will result in a disrespect for order and an impairment in the administration of justice. To this end, therefore, any such order or rule must have a reasonable or plausible basis, else this discretionary power is subject to being declared arbitrarily exercised" *(Matter of Peck v Stone,* 32 AD2d 506, 508 [order of Judge prohibiting female attorney from wearing miniskirt in courtroom was arbitrary]).

In addition, petitioners contend, and it is not disputed, that Justice Roberts took issue not with the fact that petitioners wore buttons but with the message expressed. Thus, petitioners assert he told them that he would permit the wearing of "Save the Whales" buttons. What obviously concerned him was the content of the button itself which he felt would be "unsettling" to the client.

Our Court of Appeals has noted the different approach that must be taken when there is an official attempt to restrict *content* of speech as compared with its time, place and manner. "The State is permitted considerably more latitude in restricting the time, place and manner of speech than it is when it attempts to restrict content. Time, place and manner restriction are valid if reasonable and rationally related to legitimate State interests. Content or subject matter may be regulated only if substantial State interests are involved and then the regulation may go no further than necessary to serve that interest." *(Matter of von Wiegen,* 63 NY2d 163, 171.) "[U]nder the Equal Protection Clause, not to mention the

First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it my not select which issues are worth discussing or debating in public facilities". *(Police Dept. of Chicago v Mosley,* 408 US 92, 96.) Since Justice Roberts indicated that a political button for an ecological cause ("Save the Whales") would be favored where the instant labor-relations related button was not, a "substantial" or "compelling" governmental interest in restricting the content of the button must be demonstrated *(see, Perry Educ. Assn. v Perry Local Educators' Assn.,* 460 US 37, 45; *Carey v Brown,* 447 US 455, 461-462). Here, although Justice Roberts termed the buttons "unsettling" to defendants clients, he made no inquiry of the client, petitioner Smith, and thereafter relieved counsel for petitioner Smith despite his objection.

Thus, the record before us does not demonstrate a "compelling" State interest necessitating the Justice's complete ban on the mere display of the small button with a particular political message. *(See, Perry Educ. Assn. v Perry Local Educators' Assn., supra,* at 45.) Indeed, in light of the fact the button was worn in a nonjury courtroom, there was no showing of any "significant" governmental interest which would be served by a blanket ban, under the circumstances, in the place, manner and time of display *(see, Regan v Time, Inc.,* 468 US 641, 648). The presumption of the court that the button had an "unsettling" and disruptive effect was made, without any inquiry or other factual foundation, and was therefore an improvident exercise of the court's authority to control the courtroom and the proper administration of justice. *(See, Matter of Peck v Stone, supra.)* In addition, the court's action violated the First Amendment and article I, § 8 free speech rights of petitioners.

"The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours. It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests." *(Cohen v California,* 403 US 15, 24.)

Accordingly, the application by petitioners pursuant to

CPLR article 78 for an order prohibiting respondent Justice George Roberts from enforcing his judgment and order requiring petitioner attorneys, on penalty of being relieved or held in contempt, to remove a political button which stated "Ready To Strike" from their lapels and requiring the restoration of the petitioner Legal Aid Society to the representation of petitioner Albert Smith, should be granted, without costs or disbursements.

WALLACH, J. (concurring). The court's ruling in this case summarily dissolved the lawyer-client relationship in two pending criminal cases based upon conduct which it allegedly perceived as impairing that relationship, namely, the lawyer's in-court display of a lapel button containing the legend "Ready To Strike". It also appears that in a subsequent conference on the matter the Judge indicated a toleration for the button display of some other opinions, citing as a permissible example the oceanic environmentalists' crusade to "Save the Whales".

If the choice had to be made between saving the lawyers or saving the whales, there is little doubt that the overwhelming majority of Americans would come down on the side of the whales. But the fact that the Calendar Judge here found himself allied with that majority must be the beginning and not the end of our review. In this case the Attorney-General, defending on appeal the challenged ruling which instantly discharged each lawyer who wore the offending "Ready To Strike" lapel button, seems to acknowledge that the controversy is not to be resolved by such a content analysis of the assertive message. First Amendment rights, it is conceded, cannot be automatically left to the not always tender tyranny of the majority viewpoint. The justification for the order raised before us (albeit not too clearly advanced in the record itself) is that a Legal Aid client, viewing the button for the first time, might undergo a tremor of unease, as expressed in the Attorney-General's brief, "by causing the indigent criminal defendant to lose confidence in the system's ability to guarantee him his constitutional right to vigorous representation." This argument, implicating as it does the "undivided loyalty" to the client required of an attorney (see, People v Ortiz, 76 NY2d 652, 656), is worthy of our focused attention.

No stronger statement in Anglo-American law of the single-minded duty owed by attorney to client can be found than that of Henry Brougham, who at the pinnacle of his career

was retained to defend Queen Caroline of England in her trial on the charge of adultery before the British House of Lords. The complainant here was, of course, the reigning monarch, King George IV. Thus, immediately brought into play was the conflict between the duty of loyalty from subject to sovereign (a breach of which could amount to treason) and the professional duty of counsel to client. Lord Brougham had no doubts as to where the path of duty lay, as he informed his fellow peers: "[A]n advocate, in the discharge of his duty, knows but one person in all the world, and that person is his client. To save that client by all means and expedients, and at all hazards and costs to other person, and, among them, to himself, is his first and only duty; and in performing this duty he must not regard the alarm, the torments, the destruction which he may bring upon others. Separating the duty of a patriot from that of an advocate, he must go on reckless of consequences, though it should be his unhappy fate to involve his country in confusion."[1]

This stirring formulation had even its 19th century critics (Chief Justice Cockburn among them)[2] as well as modern ones, but since it represents perhaps the historical high-water mark of the definition of total devotion to be summoned by counsel to the client's cause, let us accept it, for the benefit of the respondent Judge, as the Valhallan standard which he proposed to enforce. Even if we adopt that proposition, what is lacking here to sustain the court's order are any findings or proofs that counsels' representation here fell below this heroic level, or that the button message did, in fact, have any chilling effect on the equanimity of any particular client. The one client we know anything for certain about, petitioner Albert Smith, is a party to this proceeding; he stands before us objecting to the discharge of his counsel and seeks her reinstatement with, or without, the allegedly offensive button.

The Attorney-General embraces the court's assumption that a client's morale would necessarily be shaken once the mes-

---

1. 2 Trial of Queen Caroline 8 (J. Nightingale ed 1821), cited in Fried, *The Lawyer as Friend: The Moral Foundations of the Lawyer-Client Relationship*, 85 Yale LJ 1060, n 1.

2. In 1864, at a dinner attended by the then-86-year-old Brougham, Cockburn observed: "The arms which an Advocate wields, he ought to use as a warrior, not as an assassin. He ought to uphold the interests of his clients *per fas*, but not *per nefas*. He ought to know how to reconcile the interests of his client with the eternal interests of truth and justice." (Megarry, A Second Miscellany-at-Law, at 36 [Stevens & Sons Ltd., 1973].)

sage of the button was perceived. But the stifling of First Amendment rights cannot be permitted to rest upon a mere assumption, particularly one so facially untenable as this. As a rationale for the court's action, its lack of merit is apparent from the following:

(1) The order did not enjoin future private disclosure by counsel to the client of the labor dispute and the ensuing prospect of a strike; neither was the court concerned with any disclosure in the past. The defendant-morale problem did not seem significant outside the four walls of the courtroom. Nor did the disclosure which actually occurred here of an impending strike, prior to any intervention by the Judge, appear to cause any turmoil inside the courtroom. In any event, the court made no such findings.

(2) It is not beyond all conjecture, subject only to repudiation by competent proof, that some clients might find the button message encouraging, suggesting as it does that his advocate possesses a certain energetic militancy and willingness to defy "the establishment".

(3) There is a type of experienced client, not unknown to the criminal Bar, who has learned that a swift and efficient disposition of his pending matter is ofttimes less advantageous to him than a lame and halting progress, beset by delays and obstructions at every turn. The heart of such a client, had he stood alongside one of these appellant lawyers in IAS Part 30 on October 4, 1990, before Judge Roberts, might well have leaped up to behold the message of the button, holding out, as it does, the prospect of a strike which hopefully would serve to postpone the day of reckoning in his case. Delay in a criminal case, as such a client knows, plays into his hands far more frequently than those of the People.

Since, therefore, the order rests entirely on an unproven assumption, the validity of which is dubious at best, the arraignment court's summary directive constituted an arbitrary exercise of judicial power, and must be reversed on that ground.

KUPFERMAN, J. P. (dissenting, in part). A courtroom is not a place for the unrestricted marketing of ideas. The petitioner was free to wear a button outside the courtroom and even to picket outside the courthouse. (See, Wise, *One-Day Work Stoppage by Legal Aid Lawyers*, NYLJ, Jan. 30, 1991, at 1, col 3.)

Petitioner and her colleagues were in the courtroom to represent clients. They were not spectators. The Court of

Appeals has emphasized the single-minded allegiance owed by an attorney to the cause of the client. *(See, People v Ortiz,* 76 NY2d 652.)

A Judge may or can be perturbed by irrelevant issues or by the impingement of a threat to the repose necessary for judicious consideration of the problems before her or him. The petitioner is an officer of the court. She should have assisted in rather than resisted attaining that end.

The majority here assumes that the Judge was concerned with the offense to his sensibilities rather than with the due administration of justice. No such assumption can be made. That I would not have reacted as the Judge did and perhaps have made a poor quip as to whether "strike" was a baseball term and the season was over, is beside the point. I do not take seriously the *in terrorem* effect of the statement on the button.

However, the Judge must have decorum in the court, and must have counsel who are in the courtroom for court business. The client must know that the lawyer is there for him or her and not for an extraneous labor issue.

"To every thing there is a season, and a time to every purpose under the Heaven." (Ecclesiastes 3:1.) It also applies to place, and the Judge had a right to rule that the button was not, with its comment, in the proper place at the proper time.

I would deny and dismiss the petition, without costs. I would, of course, allow the intervention by the union.

CARRO, J., concurs with ASCH, J.; WALLACH, J., concurs in a separate opinion; KUPFERMAN, J. P., dissents in part in a separate opinion.

Application for a writ of prohibition granted, without costs.